**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **CAMERON LEWIS** | **CIVIL ACTION** |
| **VERSUS** | **NO: 26-1001** |
| **THE ADMINISTRATORS OF THE TULANE EDUCATIONAL FUND** | **SECTION: "E" (4)** |

## ORDER AND REASONS

Before the Court is a **Motion for Protective Order (R. Doc. 22)** filed by Defendant, the Administrators of the Tulane Educational Fund ("Defendant" or "Tulane"), seeking the Court to issue a protective order requiring Plaintiff to (1) cease all harassing and inappropriate communications to Tulane employees and administrators; and (2) direct all communications intended for Tulane employees and administrators to undersigned counsel for appropriate handling with the exception that Plaintiff may direct (a) communications about current classes and coursework to her Tulane employees responsible for class scheduling, professors and/or teaching assistants and (b) communications about current student support services to her assigned support persons, Dean Erica Woodley and/or Mr. Kyle Pearson. Tulane further requests that Plaintiff be limited to sending no more than one email per day to undersigned counsel, with that email to contain all communications and questions that Plaintiff wishes to raise. The Motion is opposed. R. Doc. 26. The matter was heard by oral argument on August 26, 2026.

## I. Introduction

### A. Factual Summary

Plaintiff Cameron Lewis ("Plaintiff" or "Lewis") is a current student at Tulane University pursuing a master's degree in physics. In 2018, Lewis contends that she was diagnosed with Post Traumatic Stress Disorder ("PTSD") and Generalized Anxiety Disorder ("GAD"). R. Doc. 1. Lewis contends that in 2025, she was diagnosed with Agoraphobia and Panic Disorder. *Id.*

Lewis contends that as of Fall 2025, she was registered with Tulane's Goldman Center for Accommodations as a student with a disability. *Id.* Lewis contends that on August 19, 2025, upon the start of the Fall 2025 semester, she requested disability accommodation from the Goldman center for remote access to her courses. *Id.* Lewis contends that Tulane did not provide her with the accommodation and that she was therefore unable to effectively participate in her coursework. *Id.* Lewis contends that when she expressed her concerns to the university, she was told to withdraw from her coursework. *Id.*

Lewis contends that on September 30, 2025, her accommodation request was approved, but it was not implemented for the Fall 2025 semester. *Id.* Lewis contends that her accommodation request was approved after the allotted timeframe for students to withdraw without penalty and as a result, she lost her tuition payments for the fall semester. *Id.*

On May 8, 2026, Lewis filed this civil action against the Administrators of the Tulane Educational Fund ("Defendant" or "Tulane"), alleging that Tulane discriminated against her based on disability in violation of the Americans with Disabilities Act ("ADA"), the Americans with Disability Act Amendment Act ("ADAAA"), 42 U.S.C. § 12101 et seq., and Section 504 of the Rehabilitation Act of 1973 ("Section 504"), 29 U.S.C. § 794. *Id.*

Lewis filed a previous suit alleging similar claims in the Fall of 2025. That suit was voluntarily dismissed in March 2026. During that suit, many communication issues arose between Lewis and Tulane, such as Lewis allegedly directing litigation-related questions to Tulane employees rather than Defense counsel, Amy McIntire. This issue among others has persisted in the instant litigation.

**B. Subject Motion for Protective Order**

On August 18, 2026, Tulane filed the instant Motion for Protective Order. R. Doc. 22. In its Memorandum in Support, Tulane argues that Lewis's "inappropriate and harassing" communications have "recently escalated and become constant and untenable." R. Doc. 22 at 1. Tulane cites various examples.

First, Tulane cites a series of AI-generated cartoons that Lewis allegedly created and emailed to several Tulane employees. R. Doc. 22-1 at 5-6. Tulane's Counsel argues that Lewis's messages alongside the AI-generated cartoons—such as "I heard a scary movie is not showing at your institution, so I drew a pretty picture of you. I was hoping to get it autographed"—are harassment. R. Doc. 22-1 at 4.

Tulane proffers another example wherein between approximately July 31, 2026, and August 10, 2026, Lewis allegedly communicated legal questions intentionally disguised as disability-related questions to her assigned Disability Resource Professional ("DRP"), Jessica Machado ("Machado"). *See* R. Doc. 22-8. On July 31, 2026, Lewis asked Machado to reassign her to a different DRP that is not directly involved in Lewis's pending litigation against Tulane. *Id.* at 3. Additionally, Lewis identified her concerns that she is unable to ask questions to her own DRP about her accommodations as a student because she keeps getting redirected to Tulane's Counsel.

On August 4, 2026, Machado confirmed that she would remain Lewis's DRP. That same day, Lewis emailed Machado a list of questions regarding subjects such as who is responsible for administering her disability accommodation requests, Machado's discretion to exercise independent professional judgement in granting or denying her requests, whether Tulane's Counsel has any role in the administration of Lewis's accommodations, and whether the process for administering her accommodations has changed due to the pending litigation. *Id.* at 7.

On August 7, 2026, Machado informed Lewis to direct her questions to Tulane's Counsel. *Id.* at 6. On August 10, 2026, Tulane contends that Lewis again directed the same questions to Machado. R. Doc. 22-9. On August 11, 2026, Machado again redirected Lewis to Tulane's Counsel and Lewis communicated her confusion as to whether her DRP could outsource her disability-related questions to Tulane's Counsel, and why her questions were considered litigation-related such that they needed to be referred to Tulane's Counsel. *Id.* at 5. After receiving no clear answer, Lewis requested a meeting with Michael Fitts, the President of Tulane University.

Tulane argues that Lewis has refused to appropriately communicate with Tulane's Counsel under the guise that she has an attorney, even though Lewis is *pro se*. Tulane refers to multiple emails in which Lewis has given allegedly fake phone numbers to Tulane's Counsel after claiming that she has an attorney. R. Doc. 22-11. Tulane alleges that these are Lewis's attempts to avoid directly communicating with Tulane's Counsel. Tulane argues that Lewis has abused the *pro se* process.

Finally, Tulane attaches exhibits regarding Lewis's requests for Tulane to provide her with someone to advise her through the complicated process of making internal complaints with Tulane's Equal Opportunity Office. R. Doc. 22-10. Tulane refers to Lewis's internal complaints in its Motion and supporting Memorandum but attaches additional exhibits wherein Lewis advocated for another Tulane student, George Zhao. It is unclear whether such communications are relevant to the ongoing litigation between the parties.

On August 20, 2026, Lewis filed her Memorandum in Opposition to the instant motion. R. Doc. 26. Lewis acknowledges that during litigation, there may be a need for protective order, but not one that is so broad that it encompasses even non-litigation-related communications. *Id.* Specifically, Lewis expresses her concern that a sweeping protective order granted in Tulane's

favor would prevent her from accessing information about her accommodations which she utilizes in her everyday academic life. *Id.* Further, Lewis contends that her AI-generated "artwork" has been taken too seriously by Tulane. *Id.* Lewis contends that such "artwork" was created as an expressive form of criticism, and it clearly used satire, exaggeration, and imagery to display her message. *Id.* Lewis argues that Tulane "may dislike the message or consider the imagery unsettling, but those reactions do not by themselves establish a true threat, harassment, or good cause for a sweeping prior restraint." R. Doc. 26 at 2.

On August 26, 2026, the subject Motion was heard by oral argument before this Court. R. Doc. 33.

## II. <u>Standard of Review</u>

### A) Protective Orders

According to Rule 26(c)(1) of the Federal Rules of Civil Procedure, "[a] party or any person from whom discovery is sought may move for a protective order in the court where the action is pending." FED. R. CIV. P. 26(c)(1).

The district court is entrusted wide discretion to decide whether to and to what extent to issue a protective order. *Nguyen v. Excel Corp.*, 197 F.3d 200, 209 n.27 (5th Cir. 1999) (citations omitted). For example, the court may order that the parties conduct discovery by a particular method. FED. R. CIV. P. 26(c)(1)(C).

If the movant demonstrates "good cause," the court may issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." FED. R. CIV. P. 26(c)(1). Rule 26(c)'s "good cause" requirement indicates that the party seeking a protective order has the burden "to show the necessity of its issuance, which contemplates a particular and specific demonstration of fact as distinguished from stereotyped and conclusory statements." *In re*

*Terra Int'l, Inc.*, 134 F.3d 302, 306 (5th Cir. 1998) (quoting *United States v. Garrett*, 571 F.2d 1323, 1326 n.3 (5th Cir. 1978)).

"Harassment" is not mentioned by Rule 26, but it is reasonably contemplated. For the purposes of this Order, "Harassment" is defined as "[u]nwarranted speech or behavior causing annoyance, alarm, distress, or intimidation, usually occurring persistently over a period of time." *Harassment*, OXFORD ENGLISH DICTIONARY ONLINE (3d ed. 2023).

**B) Pro Se Litigants**

The Fifth Circuit has held that "*pro se* pleadings are held to less stringent standards than pleadings drafted by lawyers," and "*pro se* pleadings must be treated liberally." *U.S. v. Robinson*, 78 F.3d 172, 174 (5th Cir. 1996); *Priester v. Lowndes County*, 354 F.3d 414, 418 (5th Cir. 2004).

However, *pro se* litigants are not exempt from complying with the Federal Rules of Civil Procedure and the Local Rules. *NCO Fin. Sys., Inc. v. Harper-Horsley*, No. 07-4247, 2008 WL 2277843, at *3 (E.D. La. May 29, 2008) (quoting *Birl v. Estelle*, 660 F.2d 592, 593 (5th Cir. 1981). Further, *pro se* status does not "relieve [a litigant] of the obligation to comply with the governing rules addressing the proper means of obtaining discovery." *Jackson v. Navy Fed. Credit Union*, No. 25-1821, 2026 WL 2937668, at *1 (E.D. La. Sept. 30, 2026).

This also means that *pro se* litigants must follow the applicable ethical rules, which in this District are the Louisiana Rules of Professional Conduct. *See* E.D. La. LR 83.2.3, 83.2.7. Rule 4.2 of the Louisiana Rules of Professional Conduct provides that unless the other lawyer consents, a lawyer or *pro se* litigant shall not communicate about "the subject of the representation" with a person the lawyer or *pro se* litigant knows to be represented by a lawyer in the matter. La. Rules of Prof'l Conduct R. 4.2. This necessarily includes communications with individuals the lawyer or *pro se* litigant knows to be a "director, officer, employee, member, shareholder or other

constituent of a represented organization" who either (1) "supervises, directs or regularly consults with the organization's lawyer" about the matter; (2) "has the authority to obligate the organization with respect to the matter; or (3) whose act or omission in connection with the matter may be imputed to the organization for purposes of civil or criminal liability." *Id.*

### C) Methods of Discovery

Discovery in federal court is governed by the Federal Rules of Civil Procedure. The scope of discovery is governed by Rule 26, which provides that "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." FED. R. CIV. P. 26(b)(1). Information within this scope need not be admissible at trial to be discoverable *Id.*

If a party is represented by an attorney, service of discovery requests must be made on the attorney unless the court orders otherwise. FED. R. CIV. P. 5(b)(1).

Parties seeking to gather discoverable information may do so by multiple methods, including oral or written depositions (Rule 30 and Rule 31), interrogatories (Rule 33), requests for production of documents or tangible things or to permit entry onto land (Rule 34), physical and mental examinations (Rule 35), and requests for admission (Rule 36). FED. R. CIV. P. 30, 31, 33, 34, 35, 36. Any deficiencies with discovery responses are governed by Rule 37.

## III. Analysis

Tulane argues that Plaintiff's communications to Tulane employees and Tulane Counsel are inappropriate and harassing, and that a protective order limiting the nature and frequency of such communications is necessary. Tulane additionally contends that Plaintiff is abusing her *pro se* litigant status by not following the Rules of Civil Procedure regarding proper discovery methods, this District's Local Rules, and the Louisiana Rules of Professional Conduct. As support,

Tulane compares Plaintiff's behavior to that demonstrated in *Eustice v. Louisiana Through Bd. Of Supervisors of Louisiana State Univ.*, No. 18-1008, 2020 WL 3520298 (M.D. La. June 29, 2020).

Plaintiff concedes to reasonable regulation of her communications which are objectively inappropriate and/or harassing. However, Plaintiff argues that Tulane provides no definition for "harassment" or "inappropriate" with which to assess the communications at issue. Further, Plaintiff argues that this case is distinguishable from *Eustice*. Plaintiff expresses concern that a broad protective order limiting her communication with Tulane employees would impede upon her right to university support services in her capacity as a student. Plaintiff requests that any protective order issued by the Court provide safeguards to protect Plaintiff's access to student services separate from this litigation.

**A) AI Generated Images**

It is undisputed that Plaintiff created and communicated AI-generated "artwork" featuring depictions of interactions with the Tulane Goldman Center for Student Accessibility, the Equal Opportunity Office, and other internal offices at the university. *See* R. Doc. 22-1 at 5-6. Tulane points to these images as examples of why it should be granted a protective order.

The disputed images depict Plaintiff's opinions, emotions, and personal feelings about various Tulane offices. The Court finds such communications are inappropriate in the context of litigation. The Court finds that illustrations of this nature should not be communicated by Plaintiff to Tulane employees or Tulane's Counsel.

In line with the requirements set forth by the Fifth Circuit in *In re Terra Int'l*, 134 F.3d at 306, these images demonstrate specific facts sufficient to necessitate the issuance of a protective order. To this extent, Tulane has satisfied its burden of demonstrating "good cause" and therefore,

the Court grants Tulane's request for a protective order to prevent future communications by Plaintiff of this nature.

**B) Frustration & Confusion Do Not Constitute Harassment**

Tulane cites a few other examples of Plaintiff's communications to Tulane employees which Tulane contends constitute harassment. However, for the reasons assigned below, the Court finds that they are not harassment.

First, Tulane cites an email sent by Plaintiff on March 11, 2026, to unidentified Tulane employees—likely Tiffany Smith, the Director of Equal Opportunity & Resolution Management ("Smith"), and Erica Woodley, Dean of Students ("Woodley")—to express her frustration and confusion as to why Tulane employees were redirecting her emails to Tulane's Counsel when in a previous proceeding, Plaintiff was "excluded from conferring or communicating with" Tulane's Counsel. R. Doc. 22-5 at 2-3. Plaintiff expressed her concern that Tulane was retaliating against her for filing separate internal complaints. *Id.* at 3. Specifically, Plaintiff expressed that Tulane was creating barriers to her access to student resources by redirecting all her questions to Tulane's Counsel, including those unrelated to the litigation. *Id.*

After receiving no response, Plaintiff followed up with Smith and Woodley on March 22, and again on April 2, 2026. *Id.* at 2. On April 3, 2026, Smith redirected Plaintiff to Tulane's Counsel allegedly because of Plaintiff's previous, voluntarily dismissed civil action against Tulane. *Id.* at 1. Smith did not address any of Plaintiff's questions regarding her access to student resources, and Tulane offers no real argument as to why these communications constitute harassment.

Upon considering these communications, the Court finds that behavior of this nature is not harassment but is instead Plaintiff expressing her confusion and frustration with simultaneously

navigating *pro se* litigation and maintaining her access to student resources. The Court advises Plaintiff to proceed with caution when using legal terms like “retaliation” in communications she intends to be unrelated to the litigation.

However, such language and Plaintiff’s confusion should not automatically result in Tulane employees redirecting Plaintiff’s emails to Tulane’s Counsel without answering what is within the scope of their authority as Tulane employees. Such behavior further perpetuates the instant communication issues. For example, an email regarding Plaintiff’s internal requests and complaints with the university, such as FERPA requests or Equal Opportunity complaints, are not to be redirected to Tulane’s Counsel. If Tulane employees are unsure what portions of Plaintiff’s communications are separate from the litigation and within the scope of their authority to respond, they should consult Tulane’s Counsel prior to redirecting the entire communication.

Second, Tulane presented another piece of “evidence” to the Court at oral argument. On or around August 19, 2026, Plaintiff allegedly contacted Samantha Burns of Tulane’s Office of Student Conduct to ask whether Tulane’s allegation of harassment against Plaintiff in the instant Motion triggers a finding of harassment by the internal Office of Student Conduct. Plaintiff allegedly expressed concern about a potential finding of harassment against her in her capacity as a student without there ever having been an internal investigation or hearing.

Again, the Court finds that communications of this nature do not constitute harassment. Like the Court’s advice to the Plaintiff, this Court advises Tulane to be careful with its use of legal terms such as “harassment” in this litigation which may reasonably cause Plaintiff to believe implicates her administrative rights in her capacity as a student.

**C) Plaintiff's *Ex Parte* Communications**

As a *pro se* litigant, Lewis is not exempt from complying with relevant procedural and substantive rules, including the Federal Rules of Civil Procedure, this District's Local Rules, and the Louisiana Rules of Professional Conduct. *NCO Fin. Sys., Inc.*, 2008 WL 2277843, at *3. Although Lewis is not a licensed and practicing attorney, she consents to proceed under these Rules by representing herself in the instant litigation. *See Birl*, 660 F.2d at 593 ("One who proceeds *pro se* with full knowledge and understanding of the risks involved acquires no greater rights than a litigant represented by a lawyer . . . [r]ather, such a litigant acquiesces in and subjects himself to the established rules of practice and procedure.").

Along with its allegations of harassment and inappropriate communications, Tulane argues that Plaintiff is abusing her status as a *pro se* litigant by participating in ex parte communications in violation of Rule 4.2 of the Louisiana Rules of Professional Conduct.

To support this, Tulane attempts to draw comparisons to *Eustice v. Louisiana Through Bd. Of Supervisors of Louisiana State Univ.*, 2020 WL 3520298, at *8 (M.D. La. June 29, 2020). In *Eustice*, the U.S. District Court for the Middle District of Louisiana granted the defendant-university's motion for sanctions and dismissed the plaintiff-student's claims against the university with prejudice due to the plaintiff's abhorrent communications used to harass defense counsel. *Id.* at *7.

Previously, the court had entered a protective order in favor of the defendant-university which required the *pro se* plaintiff to halt all direct communications with university faculty and administrators, and to route all communication to the defendant through defense counsel. *Id.* at *2. The protective order was entered to protect university faculty members and administrators based on plaintiff's violations of the university Code of Student Conduct, including being placed on

disciplinary probation, providing falsified academic records, and plaintiff's arrest for cyberstalking a fellow student with sexual advances. *Id.* at *1. However, the plaintiff used this instruction as an excuse to harass and indirectly threaten defense counsel. *Id.* at *2.

The court focused on the plaintiff's history of formally charged violations of university rules and the sexually explicit nature of many of the communications sent to defense counsel and an opposing party. *Id.* at *1, 3-5. The plaintiff also obtained personal information about defense counsel, including personal phone numbers and emails of defense counsel, which he used to indirectly threaten defense counsel by expressing his desire to personally sue defense counsel, utilizing curses, referencing his "physique and bodybuilding regimen, his feelings toward women, his ownership of weapons," and sending nude images. *Id.* at *5-7. The court reasoned that dismissal of the plaintiff's claims was an appropriate sanction because of the severity of the plaintiff's violation of the court's previous order for the plaintiff to communicate with defense counsel rather than directly with the defendant. *Id.* at *7.

While Tulane did cite relevant law for the proposition that a *pro se* plaintiff may not use their *pro se* status as a shield against following procedural and professional rules, the plaintiff in *Eustice* is very distinguishable from Lewis. *Id.* at *8 (citing *NCO Financial Systems, Inc. v. Harper-Horsley*, No. 07-4247, 2008 WL 2277843, at *3 (E.D. La. May 29, 2008) (internal citation omitted). For one, the plaintiff in *Eustice* was charged with multiple violations of the university's Code of Student Conduct for plagiarism and lying about his academic record, and he was arrested for cyberstalking another student. *Id.* at *1. Lewis has not been charged with any similar type of violation of a Tulane internal rule, nor has she been arrested for stalking Tulane employees or related people.

Second, the plaintiff in *Eustice* was sending far more explicit, consistent, threatening content to LSU defense counsel. Here, Lewis has sent lots of emails to Tulane's Counsel and previously refused to communicate with her, but Lewis now agrees to work with Tulane's Counsel. As to other Tulane employees, Lewis sent critical AI-artwork, which is certainly off-putting but does not suggest any indirect threat of violence or harm. Third, the plaintiff in *Eustice* was subject to sanctions for a previously issued protective order. Conversely, no formal order has been issued by a court for Lewis to violate.

Despite this, Tulane is correct that Lewis should be directing all litigation-related questions and inquiries to Tulane's Counsel. *See* E.D. La. LR 83.2.7; La. Rules. Prof'l. Conduct R. 4.2. Rule 4.2 of the Louisiana Rules of Professional Conduct provides that unless the other lawyer consents, a lawyer or *pro se* litigant shall not communicate about "the subject of the representation" with a person the lawyer or *pro se* litigant knows to be represented by a lawyer in the matter. La. Rules of Prof'l Conduct R. 4.2. As a represented organization, Rule 4.2 also extends to many of Tulane's employees. *See id.* Here, the "subject of the representation" necessarily includes the events at issue in this litigation regarding Plaintiff's Fall 2025 accommodation requests, including who had authority over those requests, what the process was for assessing those requests, what information was considered in assessing those requests, etc. Essentially, the "subject of the representation" necessarily includes asking Tulane employees questions which could bear on the university's liability in Plaintiff's instant litigation.

However, Tulane's Counsel concedes that she instructed Plaintiff to communicate with certain Tulane employees regarding her disability accommodations, and now Tulane argues that Plaintiff has been exceeding the scope of that consent by asking questions related to the subject of the instant litigation. Between July 31, 2026, and August 10, 2026, Plaintiff repeatedly

communicated a list of questions to her Disability Resource Professional, Jessica Machado. *See* R. Doc. 22-8; R. Doc. 22-9. Plaintiff asked about Machado's exercise of independent professional judgment regarding Plaintiff's accommodation requests, for the identity of the individual who has final authority to approve or deny her accommodations requests, the identity of who is responsible for the review of her medical records in connection to her accommodation requests, and other questions about Tulane's internal process of administering and/or resolving students' pending accommodations requests. *See* R. Doc. 22-9 at 1-2.

The Court finds that Plaintiff's questions are legal questions which relate to the subject of the representation in violation of Rule 4.2 of the Louisiana Rules of Professional Conduct. La. R. Prof'l Conduct R. 4.2. Particularly, the Court finds that Plaintiff's questions relate more to the issue of Tulane's potential liability for Plaintiff's ADA claims than such questions may relate to the facilitation of Plaintiff's current accommodation requests. Permitted disability-related questions include anything that allows Lewis to function in the school as a student, including attending class, studying, taking tests, etc. Anything else is litigation-related. The Court finds that Plaintiff must separate her requests about the facilitation of her disability requests in her capacity as a student from legal questions in her capacity as a *pro se* litigant.

Further, to ask legal questions of Tulane employees, Plaintiff must employ formal discovery methods in accordance with the Federal Rules of Civil Procedure, including interrogatories, requests for production of documents or things, and depositions. The Court recommends that Plaintiff review Rules 26 through 37, which discuss the scope of discovery, procedure to obtain discovery, and enforcement mechanisms for noncompliance. Plaintiff must serve all discovery requests upon Tulane Counsel, not upon Tulane employees. *See* FED. R. CIV. P. 5(b)(1).

**D) Plaintiff's Designated Contacts**

To prevent further communication issues between Lewis and Tulane, it is necessary for the Court to outline the individual Tulane employees and non-employees that Plaintiff may contact. Such designations will ensure that there is no further disturbance to Lewis's access to disability accommodations and support services in her capacity as a Tulane student and additionally will clarify which individuals she should not contact because they are involved in the instant litigation.

First, previously, Tulane assigned Machado and Woodley—both of whom are witnesses in the instant litigation—as resources for Plaintiff's separate disability requests and support services. Tulane's Counsel concedes that she directed Plaintiff to communicate with Machado and Woodley regarding her current disability accommodations but argues that Plaintiff has taken to demanding that these employees answer interrogatory-style questions related to her present lawsuit. R. Doc. 22-1 at 6.

As previously discussed, the Court finds that Plaintiff's questions directed to Machado and Woodley between July 31 and August 10, 2026, are legal questions related to the subject of the instant litigation and thereby constitute inappropriate ex parte communications in violation of La. R. Prof'l Conduct R. 4.2. *See* R. Doc. 22-8; R. Doc. 22-9. However, given Machado and Woodley's involvement as key witnesses in the instant litigation, it was inappropriate for Tulane's Counsel to permit Plaintiff to communicate with them about non-litigation related matters in the first place, especially given Tulane's Counsel's knowledge of the history of communication issues between the parties.

Further, because Machado is a key witness in Tulane's case, and because the lines therefore become murky as to whether certain questions are disability-related or litigation-related, the Court orders that Plaintiff be assigned a new Disability Resource Professional. At oral argument, the

Court facilitated the assignment of Angela James, a non-witness, to serve as Plaintiff's DRP. Plaintiff may further direct disability-related questions to Ms. James, but she should proceed with caution to avoid asking Ms. James legal questions.

Next, regarding Plaintiff's concern about being restricted to specific case management and victim services personnel, Tulane assigned Plaintiff two case managers—Woodley and Kyle Pearson, Director of Tulane's Case Management & Victim Support Services ("Pearson")—to provide victim support services to Plaintiff in connection to an unrelated criminal matter in which Plaintiff is a victim-witness. Plaintiff believes that her request to be reassigned to a different case manager is an accommodation request. As to Pearson, Plaintiff contends that she would be more comfortable being assigned a female case manager given the sensitive nature of the criminal matter in which she will be testifying. The Court finds Plaintiff's concern to be legitimate.

Further, the Court finds that Tulane's alternative offer of Woodley is not appropriate because Plaintiff has initiated a separate, ongoing equal opportunity complaint in which Woodley is a respondent, thereby making Woodley's assignment as her case manager a conflict of interest. Tulane contends that there are no other qualified personnel available to provide Plaintiff adequate support, and the Court agrees. The Court has connected Plaintiff with Hannah Blalock at the New Orleans Family Justice Center to coordinate non-university affiliated victim support services.

Finally, as a student, Plaintiff is entitled to remain in communication with her current professors, and/or research assistants regarding her current classes and coursework, and employees responsible for class scheduling. Plaintiff may remain in contact with the following Tulane employees, as identified by Plaintiff at oral argument: Professor Mark Melasky, Professor Stephanie Mease, Mr. Robert Sanchez, and Dr. Dennis Bondar. To the extent that these professors

change, the Court asks that Plaintiff provide a list of names to the Court and to Tulane's Counsel to ensure that such individuals are in the zone of proper communication.

There are two professors who Plaintiff should not communicate with due to their status as witnesses in the instant litigation. Specifically, Plaintiff will not communicate with Dr. Ryan Glasser or Dr. John Perdew because they were both her professors in the Fall 2025 semester at issue in this litigation, and they may be called as witnesses by Tulane.

**E) Frequency of Plaintiff's Communications**

Tulane requests that Plaintiff be limited to no more than one communication with Tulane's Counsel per day in which Plaintiff must express all thoughts and inquiries. Tulane contends that this request was made as a precaution to prevent Tulane's Counsel from getting "20 emails an hour" from Plaintiff but does not point to any example in which Plaintiff initiated communications at this frequency and quantity.[1]

The Court finds Tulane's request to be too restrictive and declines to impose any specific limit on the frequency and quantity of Plaintiff's communications to Tulane's Counsel. However, given the clarifications provided by this Order regarding who Plaintiff may contact about what, communications directed or redirected to Tulane's Counsel should be less frequent overall.

Plaintiff agrees to communicate with Tulane's Counsel regarding the instant litigation.

## IV. <u>Conclusion</u>

**IT IS ORDERED** that the Defendant's **Motion for Protective Order (R. Doc. 22)** is **GRANTED** in part and **DENIED** in part.

[1] The Court understands that Tulane is likely referring to an email sent to Plaintiff by Tulane's Counsel on March 27, 2026, in which Tulane's Counsel attempted to address Plaintiff's "several emails" regarding which Tulane employees Plaintiff may communicate with, Plaintiff's FERPA requests, setting up a meeting with Tulane's sexual misconduct response team, and whether Tulane's Code of Student Conduct is a binding contract. R. Doc. 22-4 at 1.

**IT IS GRANTED** to the extent that Plaintiff shall not communicate inappropriate AI-generated images to Tulane employees or Tulane's Counsel for the remainder of this litigation.

**IT IS FURTHER GRANTED** to the extent that Plaintiff shall not participate in *ex parte* communications related to the subject of this litigation with Tulane employees in violation of Rule 4.2 of the Louisiana Rules of Professional Conduct.

**IT IS FURTHER GRANTED** to the extent that Plaintiff shall not communicate directly with Tulane employees designated in this Order as witnesses for the remainder of this litigation.

**IT IS DENIED** to the extent that Plaintiff is otherwise permitted to communicate with Tulane employees regarding non-litigation-related matters, subject to limitations laid out in this Order.

**IT IS FURTHER DENIED** to the extent that Tulane employees with whom Plaintiff is permitted to communicate shall not automatically redirect Plaintiff's non-litigation-related communications to Tulane's Counsel if such communications are within the scope of their employment.

**IT IS FURTHER DENIED** to the extent that Plaintiff's communications to Tulane employees and Tulane's Counsel do not constitute harassment.

**IT IS FURTHER DENIED** to the extent that the frequency and quantity of Plaintiff's communications to Tulane's Counsel shall not be limited.

New Orleans, Louisiana, this 16th day of October 2026.

**KAREN WELLS ROBY**
**UNITED STATES MAGISTRATE JUDGE**